## Williamson, &c. *vs.* Williamson, &c. Case 43.

APPEAL FROM KENTON CIRCUIT. PET. EQ.

1. The word *heir*, in its strict techincal sense, denotes the person on whom, at the ancestor's decease, the law casts the inheritance. No person can properly sustain the character of heir in the lifetime of the ancestor. (*Jarman on Wills, vol. 2, side page,* 13.) Wherefore, a limitation to the heirs of a person in existence, (if it have the other qualities of a remainder,) must be a contingent

remainder. (*Fearne on Remainder, chapter* 1, *section* 2, *side page,* 5.)

2. The principle "that the present capacity of taking effect in possession, if the possession were to become vacant, and not the certainty that the possession will become vacant before the estate limited in remainder determines, universally distinguishes a vested remainder from one that is contingent," (*Walters, &c. vs. Crutcher, &c.,* 15 B. *Monroe,* 10,) has no application in a case where the event which renders the possession vacant also resolves the contingency upon which the limitation depends, and makes that certain which was before uncertain. (*Fearne on Contingent Remainder,* 9.)

3. The rule in Shelly's case has no application, and is not in force in Kentucky; and whether a remainder to the heirs of a person who takes a preceding estate in freehold is vested or contingent must be determined on general principles, inasmuch as the limitation in remainder does not vest in the ancester, nor enlarge his estate, but his heirs take under the will as purchasers, whether their interest be vested or contingent.

4. Notwithstanding the maxim "*nemo est hoeres viventis,*" the testator who devises to the "heirs" of persons in existence may show, by other expressions in the will that he uses the word in its popular sense, as denoting children, or those who, at the execution of the will, are the apparent heirs of a particular person; in such case the law construes the words in the sense intended, and the limitation is deemed as conferring a vested remainder on those designated. This principle is recognized in another class of cases. (*Harbison vs. Beaument, Pr. Wms.* 229; *Goodright vs. White,* 2 *Black.* 1010; *Heard vs. Horton,* 1 *Denio's Rep. Sup. Court N. Y.* 165.)

5. The signification of the word "heir," in all cases, is a question of intention. The word has a legal and a popular meaning. When used alone, without any other expressions going to show that it was *not* used in its legal sense, it must be understood as having been *so* used.

6. The testator's meaning, in the use of the word "heir," must be gathered from all the provisions of the will considered together.

7. The law favors that construction of a devise which will cause the interest to vest, therefore the adverbs of time, *when,* &c., *then,* &c., are taken to express the time when the remainder shall take effect *in possession,* not when it shall vest. (*Stanley vs. Stanley,* 14 *Vesey,* 491; *Perrin vs. Lyon, &c.* 9 *East.* 170; *Edwards vs. Symons,* 6 *Taunt.* 213; *Baraston's case,* 3 *Rep.* 19; *Fearne on Remainder,* 240; *Moore vs. Lyons,* 25 *Wend.* 125; *Yeaton vs. Roberts,* 8 *Foster's N. H.* 459.) The favor shown to vested interests is not however to be so pressed as to defeat the intent of the testator. (*Richardson vs. Wheatland,* 7 *Metcalf,* 171.)

8. The words used by the testator, in creating the remainder, viz: "and at *their deaths the title to the same* is to *vest* in their *heirs* in fee forever," show clearly that the testator intended so to limit the remainders given after the life estate to his daughters, that they should not vest until their deaths, respectively.

9. It is incumbent on those seeking to attach a meaning to the language used by the testator, different from its natural and literal meaning, to exhibit solid and satisfactory reasons, drawn from the subject, matter, purposes, objects, or context of the devise or provisions of the will, in support of such construction.

10. The case of *Ward, &c. vs. Tibbatts*, 10 B. Monroe, 473, is decisive of none of the questions arising in this case.

11. A devise of the *rents* and *profits* of land for the *separate and sole use* of the devisee during her natural life, is in substance and effect an appropriation of the land itself, and is a separate estate embraced by the provisions of the *Revised Statutes*, 395, which the devisee has no power to convey except in the manner therein prescribed. (*Hopson vs. Burks, &c. ante; Daniel vs. Robinson, ante.*)

12. The mode of the translation of property from one individual to another is a matter of legislative regulation. The provisions of the *Revised Statutes, chapter* 44, *art.* 4, *sec.* 17, deprives married women of no rights in their *separate estate*, and there is no doubt of the power of the legislature to enact such a law.

13. The act of 1856, (*vol.* 1, *session acts*, 1855–6, *page* 58,) provides that the provisions of the *Revised Statutes, chap.* 44, *art.* 4, *sec.* 17, shall not apply to conveyances made before the passage of the Revised Statutes, in which powers of sale and exchange were expressly given, but such powers may be executed according to the intention of the instrument.

[The facts of the case are stated in the opinion of the court.] REP.

*Moore & Wallace*, for appellants—

The appellees, Keturah M. Williamson and James T. Williamson, in March, 1855, filed their petition in the Kenton Circuit Court, stating that they are each over twenty-one years of age, and children of defendant, Jane M. Williamson, who is the wife of Geo. T. Williamson, and daughter of the late General James Taylor, who died in Newport, Ky., the place of his residence. They refer to, and make the will of General Taylor a part of their petition. They state that General Taylor, among other devises, devised his land in Kenton county, (*sec. 9 of Will*) thus:

"I direct 1,200 acres of my Bank Lick tract, (ex-
' cept the part hereinafter devised to my daughter
' Jane,) be divided into four tracts, or parcels, all of
' which shall be of equal value—as near as may be
' possible; and I give and bequeath unto each one of

' my said children, one lot or tract. *The tracts or lots* ' *which I give to my daughters, they are to have, hold, and* ' *enjoy the rents and profits of the same for their separate* ' *and sole use during their natural lives, and at their deaths* ' *the title to the same is to vest in their heirs in fee forever.* ' *The lot, or tract, which shall fall, or be allotted to my son,* ' *James, out of the said Bank Lick tract, I hereby give to* ' *him and to his heirs forever.* The 1,200 acres refer- ' red to is to be taken from the lower side of Bank ' Lick creek, including the Mills, and enough from ' the upper side of the creek to make the quantity of ' 1,200 acres, is to be taken from the land on the west ' side of Bank Lick road leading up the ridge. But ' if the said 1,200 acres is not susceptible of a fair ' and equal division, enough to make it so is to be ' added from the land west of said Mill road. The im- ' provements on the said lots are to be estimated in ' making the division—the intention is to make four ' tracts, which shall be as near as possible of equal ' value. And if my children cannot agree, them- ' selves, as to how the division shall be made, the ' county court of Kenton county shall appoint three ' capable, disinterested persons, to divide the proper- ' ty. The balance of my land in Kenton county is ' to be sold and conveyed by my executor."

They then set out the following provision from the 2d sec. of the 2d codicil to the will, viz: "And the ' balance of the land in said (Kenton) county I wish ' sold and disposed of, if my heirs desire it, if they do ' not wish it sold it will be equally divided among ' them," and then they state that the heirs elected to have the balance divided, and refer to the suit of *Taylor vs Williamson, &c.,* for partition. They then set out the first codicil to the will, viz: "In section 28 of ' my last will and testament, I demise to my daugh- ter, Jane Williamson, one hundred acres of the said ' tract I bought of Colston on Licking river, and ' Bank Lick creek, now in Kenton county, Ky., which ' 100 acres was an addition and adjoining the three ' hundred and twenty-three and one-third acres,

' which I had given her, and for which she holds my
' obligation, now I hereby revoke the devise of 100
' acres to my daughter Jane, and in lieu thereof, I
' hereby devise that my daughter, Jane, shall have
' 100 acres out of my lands in Kenton county, equal
' to the average of 1,000 acres on the south or upper
' side of Bank Lick creek, and on the most southerly
' part of such 1,000 acres, but not to bind on Licking
' river."

They then show that the land had been divided by
the Kenton circuit court, and set out a description of
the lots apportioned to Jane M. Williamson, that
said Jane has had ten children, *to-wit*: Plaintiffs, Ke-
turah and James, and defendants, Florida, William,
George, Maria, Alice, Jane, Corfield and Edward,
that Jane died before the death of General Taylor,
and that Corfield and Edward *died since his death*, and
that they died intestate, in infancy; that defendant,
George T. Williamson, claims two-ninths of the Bank
Lick land apportioned to his wife, since he claims to
be the only heir at law of his two children, Corfield
and Edward, who died since the testator; that Feb-
ruary 14th, 1855, Jane M. Williamson, uniting with
her husband, conveyed to Keturah and James two-
ninths of her life estate in the Bank Lick land, and
they pray for partition, and that two-ninths of the
land may be set off to them.

The process of the court is served on all the de-
fendants, except George and his wife, and he ac-
cepts for himself and wife, and files their joint an-
swer, in which he admits all the statements of the
petition.  They further state that Geo. T. William-
son is the only heir at law of Corfield and Edward
Williamson, and that Geo. T. and Jane M. William-
son did, in 1855, by their joint deed, convey the life
estate of two-ninths to Alexander F. Willis, of Cin-
cinnati, Ohio, who by deed, dated February 14th,
1855, conveyed the same to said Geo. T. William-
son, "so as to merge the life estate in the estate in
remainder in him;" and they unite in the prayer of

WILLIAMSON,&c
vs.
WILLIAMSON,&c

plaintiffs for partition, and ask that two-ninths may be allotted to said Geo. T. Williamson.

By an order of the circuit court, S. M. Moore was appointed guardian *ad litem*, and attorney for the infant children of Jane M. Williamson. They answer by their guardian *ad litem*, and deny that the land, in any way or to any extent, descends to Geo. T. Williamson, or the heir at law of Corfield and Edward. They rely upon the fact, that after the death of their mother, the land *must then, and not until then, vest in her heirs*, that the conveyance of Geo. T. and Jane M. Williamson to Willis, was without consideration and void, as also was that by Willis to their father. They deny all allegations that are against their interest, and ask that the court protect their interests.

Upon these pleadings and exhibits, the court below adjudged a partition, and that plaintiffs each have allotted to them *one-ninth* of the land, and that the interest of Corfield and Edward had vested, and that their father, as their only heir at law, was entitled to their two-ninths, and that the same be allotted to him, that the costs will be equally portioned between the parties interested, and paid by them accordingly, that S. M. Moore having been appointed as counsel, for the infant non-residents, he is allowed the sum of $100 paid by them to him in full for his services in that court.

To that judgment and ruling, the infants, by their attorney, appointed to defend for them, excepted, and prayed an appeal, and have accordingly brought this case to this court, and now ask that the judgment of the court below may be reversed.

By a very cursory view of the will of General Taylor, it will be seen that his estate is one of immense magnitude, and the pecuniary interests involved in the main principle to be determined in this case, are large. In fact, it is not often that any court is called upon to settle any one principle involving a greater pecuniary interest. In addition, the principles of law necessary to be understood in making

our inquiries, are the most intricate, and perhaps the most difficult to be comprehended. We can, then, but approach the case with misgivings that we shall not be able to do justice to the matters in hand. But as the case is important, and as a proper settlement of the principles involved may settle the ultimate title to a large estate and save much vexatious and expensive litigation, I have no doubt but that the learning and patient research of the court will more than make up for my own deficiencies.

1. The testator in his will (*sec.* 9) uses this language: "*the tracts or lots which I give to my daughters, they are to have, hold, and enjoy the rents and profits of the same for their separate use during their natural lives,* AND AT THEIR DEATHS THE TITLE OF THE SAME TO VEST IN THEIR HEIRS IN FEE FOREVER." We are lead to inquire what he means? That he only gives to his daughters a life estate, no one doubts But what does he mean by "their heirs," and when do they take? When does their interest vest? Does he give to their heirs a vested or a contingent remainder? These are some of the questions we must answer. To do so, we propose, first, to ascertain the rules of law that must enlighten us, and in doing so, we are not at a loss for authorities, but we find so much that we are embarrassed in determining which to select from the mass of learning and refinement on the subject of vested and contingent remainders.

A remainder is defined by Lord Coke, 1 Inst. 143 *a.* to be "a remnant of an estate in lands or tenements, expectant on a particular estate, created together with the same at one time." And probably no one has given a clearer or more concise distinction between a *vested*, and a *contingent* remainder than Fearne, in his admirable work on that very intricate subject. He says:

"That wherever the preceding estate is limited, so 'as to determine on an event which certainly must 'happen; and the remainder is so limited to a person '*in esse,* and ascertained, that the preceding estate

'may by any means, determine before the expiration 'of the estate limited in remainder; *such remainder is* '*vested.* On the contrary, wherever the preceding es-'tate is limited, so as to determine only on an event, 'which is uncertain, and may never happen; or 'wherever the remainder is limited to a person, not '*in esse,* or not ascertained; or wherever it is limited 'so as to require the concurrence of some dubious 'uncertain event, independent of the determination 'of the preceding estate and duration of the estate 'limited in the remainder to · give it a capacity of 'taking effect; *then the remainder is contingent.*'' (*Fearne on Remainders,* 217; 1 *Preston on Estates* 64, 65, 75; 4*th Kent's Com.* 201, *and* 205.)

This same doctrine and general distinction has frequently been recognized and admitted by this court. *Boone vs. Dykes,* 3 *Mon.* 529; *Turner vs. Patterson &c.* 5 *Dana,* 292; *Burnsides vs. Wall,* 9 *B. Mon.* 318; *Arnold vs. Arnold,* 11 *B. Mon.* 81; *Grigsby vs. Breckinridge,* 12 *B. Mon.* 629; and numerous other cases.

But the difficulty is not in ascertaining the general principle, but in applying that principle to a given state of case. A vested remainder depends upon an event which must happen. A contingent remainder depends on an event which is uncertain and may never happen. A vested remainder is to a person *in esse* and ascertained. A contingent remainder is to a person not *in esse,* or not ascertained. In the case of *Boone vs. Dykes,* 3 *Mon.* 537, this court decided that the remainder was contingent, because the estate was limited to dubious and uncertain persons, and in that instance the particular estate was to the mother, for life, the remainder to her children, and the class was regarded as dubious and uncertain during the life of the mother, because they were liable to diminution or increase, before the determination of the particular estate. Was that case admitted to be law we might cease our labor. But it is insisted that this case has been overruled by this court, and to some extent we admit it. In *Arnold vs. Arnold,* 11

*B. Mon.* 89, it is determined that a devise to the mother for life, and after that period some of the property to be sold, and the proceeds to be divided among her children, and other property at the same time to be divided, in kind, between them, *vests* the interest in the children at the death of the testator. But this devise is to children, and it does vest in those *in esse*, subject to open and let others in as they are born, and when the devise is thus to children, on the happening of a certain event, and nothing appears in the will to the contrary, the words are taken as words of purchase, and not words of limitation. But the reasoning of the case of *Arnold vs. Arnold* is elucidated by the case of *Grigsby vs. Breckinridge*, 12 *B. Mon.* 631, wherein the court says:

"When expressions relating to a future period are 'introduced into a devise, the question naturally aris-'es, whether they are inserted for the purpose of 'postponing the vesting, or are intended merely to 'indicate that the possession or enjoyment is to be 'deferred until the time designated. *The solution of* '*this question in every case must depend upon the intention* '*of the testator deducible from considerations arising on the* '*face of the will.*"

When the devise is to the children of a particular person, to be enjoyed at the death of the one holding the particular estate, we can easily see why it may be the intention that the interest may vest at the death of the testator, and yet the use of other terms might indicate a very different intention. Where the devise is to children, as in the cases we have referred to, unless the remainder is regarded as vested at the death of the testator, or if it is regarded as contingent, and does not vest until the termination of the particular estate, *then* if one of the children die before that time, leaving children, his children would be deprived of the estate intended for him. To prevent this state of case, and because such was certainly against the intention of the testator, this court has in *Arnold vs. Arnold*, and in *Grigsby vs.*

*Breckinridge*, and in many other cases, decided that the remainder vested at the death of the testator; and the reason is a just and equitable one, and one that should ever have weight before an enlightened court.

But still it is *the intention* of the testator, as obtained from the whole will, that must determine this question. Although we may regard the rule in Shelly's case as binding and good law, yet the rule will not be permitted to exclude the obvious intention of the testator, unless the devise itself be against law. The intention then of the testator, must determine the whole matter, and that intention must be ascertained from the whole will. (2 *Preston on Estates*, 68; *Fearne on Remainders* 201; *Homer vs. Brown*, 16 *Howard*, 367; 1*st Jarman on Wills*, 726, 741; *Arnold vs. Arnold*, 11 *B. Mon.* 89; *Grigsby vs. Breckinridge*, 12 *B. Mon.* 631.) In the case of *Burnsides vs. Wall*, 9 *B. Mon.* 323, the rule is laid down very clearly and explicitly in the following words:

"The paramount rule is that the intention of the
' testator is to be ascertained from the will, and if
' sufficiently expressed, and not in violation of law,
' is to be effectuated according to the will. All rules
' for the ascertainment of the testator's intention, are
' but means for the attainment of this object, and
' are subordinate to the great rule, that the manifest
' intention, if agreeable to law, must prevail."

Having now ascertained this "great rule," we are prepared to examine the will of General Taylor, and enquire "what is his manifest intention, agreeable to law?"

2. We suppose that we will find that he meant just what he said. He meant and intended to give the remainder to "*the heirs*" of his daughters, and he intended that the remainder should vest at no other time, than that stated by him, "*at their deaths.*" He did not mean their children or he would have said so. He could not mean children, for they are not necessarily heirs, they may not survive their parent.

*Nemo est hæres viventis.* It may be well to observe how frequently he used this same form of expression; for it is used in no less than twelve or fifteen times in the will, and also in the 2d codicil.

It is to be noticed in examining these various provisions of the will, that in the entire voluminous instrument the name of neither one of his sons-in-law occur. They are not named at all. In every instance where he devises to his son, he gives to "him and his heirs forever." In every instance where he devises to his daughters, he gives to them, to have, hold and enjoy for their natural lives, and *"at their deaths the title is to vest in their heirs in fee forever,"* or *"at their deaths to go to their heirs and assigns forever,"* or *"at their deaths to go in fee to their heirs forever,"* or *then the title to vest, at her death, in her heirs forever."* Why does General Taylor make the distinction that he does between his son and his daughters? Why is he so very particular as to limit in every instance the interest of a daughter to the period of her own life? He does not even permit a son-in-law to become tenant by the courtesy. After expressing in unmistakeable terms the estate of his daughters, he says: "at their deaths" and "then." He never omits such expressions.

"Then," *eo instanti,* "at their deaths," "their heirs" are to be invested with the title. We are at a loss to find out terms more plain and more explicit. He chose to postpone the time of vesting until the termination of the particular estate, and gave the contingent remainder to "the heirs" of his daughters, because he did not wish to exclude the grandchildren of a daughter, and because he desired that his immense estate should go to his own blood.

Read the will of General Taylor, and it will be seen that he knew the technical distinction, existing between the words "heirs" and "children."

His ferry he gives (sec. 16 of the will) "to my children who may be living, and if dead to their heirs,

the children to have, &c., for life, and then to their children."

Then he gives land, &c., to his negroes, (sec. 35 of will) and he gives to them for life, and then "to their children," thus showing that he knew the distinction, and that he knew how to transmit *a fee,* and how to create a *vested,* and a *contingent* remainder. He intended to give to the heirs of his daughters, and so long as the daughters are alive they have no heirs. During the life of a daughter, if the heir be *in esse,* it is a person unascertained, and therefore the remainder must be contingent. The heirs of Jane M. Williamson not being ascertained, and Corfield and Edward dying before their mother, and it thus being ascertained that they cannot become heirs of their mother, they never had an interest to be inherited by their father Geo. T. Williamson. This view is amply sustained by the authorities already cited. That a remainder to heirs of a living person, is classed among contingent remainders, is abundantly sustained.

"An interest may also be *contingent,* the person
' though born, is not ascertained; as the survivor of
' several persons, *or the heirs of a person who is living,*
' or a class of persons who shall attain twenty-one,
' or the like." (1 *Preston on Estates* 77; *Fearne on Remainder,* 7; 4th *Kent's Com.* 207,) and the decisions of this court already cited, sustain the same idea.

3. Thus far we have confined our examination of the will to those portions which create the estate of which we are treating. There are, however, *other* portions of the will which elucidate this question so far as to show, that in no event can Geo. T. Williamson take anything as the heir of his deceased children.

Upon this branch of the case, but little if any comment is necessary. We suspect, however, that under the power *to* sell the land devised, if we admit that the remainder to heirs is *a vested* one, it is such a vested interest as they may be divested of, and being so divested, the proceeds of the sale may be so in-

vested that the land may be in Ohio, and then Geo. T. Williamson cannot be the heir of his deceased children, so that in no point of view can he be interested in the subject under consideration. In every view we take of the will and its provisions, we find that the testator, has, at every point, so guarded it that his estate must be confined to those of his own blood.

We are strengthened in these views by the case of *Tibbatts vs. Ward*, 10 *B. Mon.* 473. In that case this court has expressly decided, that the case did not determine the extent of the interest of the grandchildren of General Taylor. The court was only called on to say whether they had any interest, or at most such an interest as would enable them to prosecute a writ of error. The court determined (and we suppose correctly) that they had such an interest. This was decided on the devise in sec. 16 of the will, which gives the ferry to his children for life, and at their deaths to their children. *Tibbatts vs. Ward, &c.* 10 *B. Mon.* 489. Then this case cannot be in our way. It, in fact, but seems to invite this very discussion.

Neither do we regard the case of *Walters vs. Crutcher*, 15 *B. Mon.* 9, as in our way. In that case the testator devised slaves in trust for his four children during their lives, and at their death, or the death of either of them, their one-fourth part to their children, should they leave any, and their heirs forever, but should either of them die without leaving a child or children, their part to go to the children of the others. Two of the children having died without issue, the question was then, whether the children of the other two, under the will, take *per capita* or *per stirpes*. The devise in that case was to the children of others as a class, and therefore the court properly decide that they take *per capita*. There was nothing in the will to controvert that idea. But the whole will in that case was construed, and the above was the conclusion. The same rule applied to General Taylor's will, has enabled us to come to our conclusions.

WILLIAMSON,&c
vs.
WILLIAMSON,&c

Nor yet is there any principle enunciated in *Wallingford vs De Bell*, 15 *B. Mon.* 551, that opposes our view of the case. The devise was money or the proceeds of sales of property, to be equally divided among children by name. By codicil the testator provided that whatever may fall to his son Lewis, "it ' is not to be given up to him, but is to be held and ' kept by my executors, and equally divided between ' *his children*, and paid over when they severally ar- ' rive at lawful age to receive it." The devise is directly to children, and of course the estate vested in them at the death of the testator, and when that is the case, we make no question, but that the father, (Lewis De Bell) would be the heir at law of his children, dying intestate, without issue, and after the testator, and that is the extent of the matters settled in that case. All this is in harmony with our views.

But now look at the case of *Tureman vs White's heirs*, 14 *B. Mon.* 560. In that case the court construed a deed which granted land "unto Solomon White during his life, *then* to his heirs forever." Af- the court had determined that the rule in Shelly's case does not prevail in Kentucky, and that the intention of the grantor must govern, it said, (*page* 577) "In the deed before us, the grant is to Solomon ' White, expressly during life, and *then* to his heirs, ' &c. Taking the word *then* to mean at his death, ' *the grant to the heirs is to take effect at the death of Sol-* ' *omon, and according to its terms, takes effect in favor of* ' *those who are then his heirs*."

We could not use language plainer or more pointed than that here quoted. There is not a reason urged in that able decision which does not apply in giving to Gen. Taylor's will that construction we are insisting upon.

4. All are interested in having the view of this court on those questions already presented. But even though we be not right, there is another question upon another section of the will, that demands our attention, and upon that section alone we may

rely for a reversal of the judgment of the circuit court. We refer to sec. 29, which says:

"Sec. 29. When any of my grandsons become of ' age, and when any of my granddaughters shall ' marry, my daughters may divide and set off to their ' said sons or daughters one-half of the estate or pro- ' perty that said grandchild would be entitled to at ' the death of their mother, &c."

This section furnishes us with the only exception in the whole will, (except *sec.* 16) to the general rule, that the interest in heirs of a daughter vests only at the death of a daughter.. The plaintiff, James T. Williamson, has "become of age. The plaintiff, Keturah, is not "married." Then Mrs. Williamson "*may*," is permitted, (not *shall*) "to divide and set-off to James T." (not the whole) but only the "one-half of the estate or property that said grandchild would be entitled to at the death of the mother." But there is not even a permission to the mother to "divide or set-off" any portion to Keturah until she married. Until that happy event she must be content without any portion of the estate of her grandfather. So far as the granddaughter unmarried is concerned, Mrs. Williamson has no discretion left her. When she marries, even then it is at the discretion of the mother to set-off to her the one-half of her contingent interest or not.

5. If by any means we can be wrong thus far, there is still one other reason why the judgment ought to be reversed. Mrs. Williamson could not make the conveyance she has made, to the plaintiffs, nor had she any power to make the conveyance she did to Willis, who conveyed to her husband. Each of these deeds are void for want of consideration, and for want of power to convey, and because she is expressly forbidden by statute to make such conveyance. (*Rev. Stat.* 395, *sec.* 17; *Session Acts*, 1855–6, *chap.* 338, *p.* 58.)

The life estate is certainly for the separate use of Mrs. Williamson, and to the exclusion of Geo. T.

WILLIAMSON,&c
*vs.*
WILLIAMSON,&c

Williamson, and she could not by reason of the statute, sell or encumber it in any way. Under the provisions of this statute, she can make no conveyance except by permission of the court, and then only for reinvestment. And the explanatory act does not, even if it could in any way cure the matter. She clearly could make no such conveyance and the particular estate is just as much in her now, as it was before the execution of those conveyances by her.

These conveyances being then void, and taken for nought, and the particular estate being yet undetermined, there is no possible chance for any such partition as that sought by Keturah and James T. Williamson, or their father Geo. T. Williamson, and the judgment of the circuit court being contrary to this view, must be erroneous.

6. One other objection and we are done. This last objection goes not to the merits. The judgment is for costs against the infant non-resident defendants. The proceeding is in no way, or to any extent of their seeking, and we can find neither reason or law for adjudging costs against them. They are even wrongfully adjudged to pay the fee to the attorney appointed to defend for them. All this, it appears to us, is without authority.

Wherefore, we ask a reversal.

*Thos. A. Marshall*, on the same side—

1. The principal question which I propose to discuss is, whether Williamson, as heir of his two deceased children, is entitled to any interest in the remainders created by the will of Gen. Taylor in the Kenton county lands. Whether the conveyance by Williamson and wife to the two children, Keturah M. and James T. Williamson, even if authorized by the will, is not prohibited by the statute—is submitted to the court. It is better for all parties that the correct principle, however rigid, should be now applied, than that there should be any uncertainty as to the title. And as by a strict pursuance of the will the

title to the portion which may be set off by the division, to a son of full age, or to a married daughter, will vest in them by force of the will itself, and cannot be subject to future division, the statute, it is presumed, would not be in the way of such an apportionment, and no hardship could occur, at least none which the will intended to prevent.

The conveyance by Williamson and wife to Willis, and by Willis back to Williamson, was unauthorized, and intended to affect that which the will intended to prohibit—(*Hopson vs. Hancock*, MSS. *opinion of present term*,) and in that point of view gave to Williamson no right of possession, and consequently no right to ask partition.

The great question, however, in this case, and that on which an immense estate in value depends, is whether the remainders in this will are *vested* or *contingent?* On this question depends the preservation of the remainders in the large estate for the benefit of the testator's posterity. It involves the violation of his clearly expressed intention with respect to these remainders, and, in effect, is a question whether so much of the instrument as creates and limits them is a will which is to regulate the division of his estate, or shall be wholly disregarded. All this depends upon the single question whether the remainders limited after the separate estate for life, given to the daughters, shall be considered as vested in such children of the testator's daughters as were living at his death, and in after-born children as they came *in esse*, or whether being created by the words that "at the death of his daughters the title is to vest (or shall vest) in their heirs in fee simple forever," with a power by the daughters, by the 29*th section* to make limited advancements, whereby the portions advanced shall vest in the son or daughter before the death of their mother, the remainders are not contingent in their creation, to become vested only at the death of the testator's daughters, and then in their heirs, unless some portions of their es-

tate by their authorized advancements, to some of their sons and daughters, may have been vested, under the express letter of the will at an earlier period.

There is no question whether the word *heirs* is a word of limitation or a word of purchase. If it was a word of limitation it would place the fee in the daughters, and there would be no remainders. But it was held by this court, in the case of *Taylor vs. Williamson, MSS. opinion of* 1854, that the daughters had but estates for life, and all the parties in this suit base their claims upon the assumption that Mrs. Williamson had but an estate for life, and that there is a valid remainder limited upon it. The word *heirs*, then, is clearly to be taken as a word of purchase, and so taken it designates the persons appointed by law to succeed to the real estate of the named ancestor upon his or her dying intestate. These persons are described in the statute of descents, so as leave few cases, when the death has occurred, in which there can be any doubt who are the heirs.

No one is heir to a living person, therefore a devise to the heirs of such person, to take effect as a remainder at the termination of a particular estate in remainder, necessarily imports a contingency, as it is uncertain whether the person mentioned will be dead or living, or who will be his heirs; or if the particular estate be given for the life of the person whose heirs are to take the remainder, it will be uncertain, until his death, who will be his heirs, and this uncertainty who will be the heir when the remainder takes effect, brings the case within the rule stated by Fearne in his fourth class of Contingent Remainders, viz : "Where the person to whom the 'remainder is limited is not yet ascertained, or not 'yet in being." (*Fearne on Remainders, chapter* 2, *section* 2, *side page,* 5.) The devise then to the testator's daughters, with remainder to their heirs, imports a contingency not to be determined until their death. (*Jarman on Wills, vol.* 2, *page* 13.)

The time when a future estate shall vest depends upon the intention of the testator, to be ascertained as in other cases from the will. This principle has been long recognized, and by this court. *Grigsby, &c. vs. Breckinridge*, 12 *B. Monroe*, 629, and other cases. Although in *Crutcher vs. Walters*, 15 *B. Monroe*, this court quotes, with apparent approbation, the rule that the present capacity to take effect in possession, if the particular estate were now to terminate, distinguishes universally a vested from a contingent remainder, it can but be recollected that this rule cannot control intention—that it has not the force of a prohibitory statute, but being a mere rule of construction for the ascertainment and effectuation of intention, it must, like all other rules of construction, necessarily yield to the clear expression of a contrary intention. And this qualification is necessarily implied, if not expressed, in every statement of the rule. Indeed, the rule itself should, by its reference to "the present capacity to take effect," &c., be understood as meaning a present capacity to take effect according to the terms and conditions of the limitation by which the remainder is created, and therefore it is contended that, if on the authority of this rule, a remainder in ordinary terms to the heirs of the tenant or donee for life, at his or her death, might, although importing a contingency which could not be fully resolved until the death of the donee for life, be regarded as vesting as soon as there were persons in being who, if they survived, would certainly be heirs, and take as such ; yet the intention as to the time of vesting being, in this case, clearly manifested by the direction that at the death of the testator's daughters the title in fee shall vest in their heirs, the vesting must be postponed until the happening of the death referred to. (1 *Jarman on Wills*, 633, *side page*, 742.)

No interest in remainder can vest in opposition to an express declaration that a devise shall not take effect until the beneficiary arrive to a certain age ; it nega-

WILLIAMSON,&c
vs.
WILLIAMSON,&c tives the idea that the interest can vest at any earlier period. (*Glanville vs. Glanville*, 2 *Merrivale*, 38.)

The testator in making his will now to be construed, and especially in the 20th, 21st, and 29th sections, clearly shows his intention to limit the remainders given, after the life estates, to his daughters, that they should not vest until their deaths respectively. The testator, to obviate what might, by previous sections of the will, appear to be a hardship, to arise from the fact that although his daughters, to whom he had given large estates, had children who, might before the death of their mother, be far advanced in years, they would not, until her death, have any fixed interest in the estate, introduced the 29th section giving the daughters the power, and at their discretion, to advance to any son on his arrival at twenty-one years of age, or daughter on marriage, a portion not exceeding one half of what such son or daughter would be entitled to on her death. This shows that the testator regarded such power as necessary to enable the daughters to make such advancement.

It is entirely clear, from the whole will, that the testator did not intend that the remainders in the devises to his daughters should take effect at his death, but on the death of his daughters.

The object of appellees counsel in insisting on the construction which they contend for, is to give the living children of the daughters of the testator an interest in the estate in remainder, and a power over it which the testator did not intend them to have, except in virtue of authorized advancements, and moreover give to the father of any of the children who might die without issue, a portion of the estate which it was clearly the intention of the testator to give wholly to the heirs of his daughter.

The decisions of this court in *Tureman vs. White*, 14 *B. Monroe*, and *Hagan vs. Stevenson*, 15 *Ib.*, show that these remainders, as they stand in the will, are not affected by the rule in Shelly's case, as there is no purpose of the testator, express or implied, that is

not fully answered by the word heirs in its legal sense, and better than by the word children.

But, if on any ground this court should consider the remainders as vested, the intention indicated by the devise to the heirs at the death of their mothers should at least have the effect of subjecting the remainders, not held under advancements, to be divested *pro tanto* on the death of the children without issue in the lifetime of their mother, so as to fulfill the manifest intention of confining the devise to the daughters of the testator.

The cases relied on by the appellees contain, as their essence, this principle only, that when a testator uses technical phrases they are to be taken in their legal sense, unless, by other words, he manifestly indicates and shows conclusively that he did not mean what they import in their legal or technical sense. We want no stronger doctrine than this to sustain our construction of this will, except so far as some of the principles stated may show a partiality for the rule in Shelly's case.

So long as the great object in the construction of wills is to effectuate the intention of the testator the construction cannot be fettered by rules. Forms may be prescribed, conveyances by deeds, which follow rules and precedents, but cannot regulate either the language or intention of testators. And even if it be true that a remainder to heirs, in general terms, upon the death of the ancestor, who takes the preceding freehold, cannot be contingent, except under the circumstances stated by him, it does not follow that it is to vest at the death of the testator, when the testator says it shall vest at a subsequent period.

To suppose that the testator intended by the 29th section of his will that when one of his daughters chose to advance one son who had arrived at twenty-one years of age, she thereby deprived herself of one-half of her estate for life, though all the rest of her children should then be minors and unmarried,

WILLIAMSON,&c
vs
WILLIAMSON,&c and not entitled to receive any advancement, is a position unwarranted.

The fair conclusion is, that the testator did not intend the remainders to vest, except by advancements under the 29th section, until the death of his daughters. The only pretext for a different conclusion is, that the testator in his will has sometimes used the word *children* as applicable to the probable heirs of his daughters. In regard, therefore, to the land in question, the limitation is to *heirs* on the death of their mother, and did not vest, and will not vest, until the death of the tenant for life.

*Geo. B. Hodge*, for appellant—

On the 7th day of March, 1855, James T. Williamson filed his petition in the Kenton circuit court setting up title by deed from his mother, Jane M. Williamson, under the provisions of his grandfather, General Jas. Taylor's will, to one-ninth of the portion allotted to Mrs. Jane M. Williamson in the Bank Lick tract of land in Kenton county, and praying partition of the same; to this petition, the son and daughters of his mother and George T. Williamson, his father, were made defendants. On the — day of June, 1855, George T. Williamson filed his answer in the nature of a cross petition, alleging *that under the provisions of the will of General Taylor, excepting special devises, one-fourth of his estate had been devised to his daughter, Jane M. Williamson, for life, with remainder in fee to her children—that a remainder had vested "eo instanti" upon the death of General Taylor in such of the children of Jane M. Williamson as were then in being subject to open and let in others who might be born— that two of the children of George and Jane Williamson had deceased, whose vested interest in remainder had been inherited by their father George T. Williamson, and that the life estate of two-ninths of the portion of Mrs. Williamson had by conveyances been passed to him, and that by operation of law, the lesser estate being merged in the greater, he was entitled to partition.* Upon these plead-

ings the chancellor entered a decree awarding to
George T. Williamson two-ninths of the portion of
the Bank Lick tract assigned by the commissioners
to Jane M. Williamson, and to reverse that decree
this appeal is taken.

It is respectfully submitted to the court that the
lower court erred in taking jurisdiction of the case
at all. If George T. Williamson had no capacity to
sue, certainly the court had no jurisdiction of the ac-
tion.

And first, had he capacity to sue, let us admit for
the moment that he had a vested remainder in the
property. So long as Mrs. Williamson's life estate
existed (it being by the terms of the will a sole and
separate estate) he could not claim partition, but he
alleges that by the deed from himself and wife to
Willis, and by the deed from Willis to him, her life
estate in two-ninths of Mrs. Williamson's property
passed to him. We maintain that the deed to Wil-
lis was void and passed nothing. The deed bears
date ————; it was to pass property lying in Ken-
tucky. Now, by the Revised Statutes of Kentucky
which went into force on the first day of July, 1852,
it is provided in *section* 17 *of chapter* 47, *page* 395,
that,

"If real or personal estate be hereafter conveyed
' or devised for the separate use of a married woman,
' or for that of an unmarried woman, to the exclusion
' of any husband she may thereafter have, she shall
' not alienate such estate with or without the consent
' of any husband she may have, but may do so when
' it is a gift by the consent of the donor or his personal
' representative

"Such estates *heretofore* created shall not be sold
' or encumbered but by order of a court of equity,
' and only for the purpose of exchange and reinvest-
' ment, for the same use as that of the original con-
' veyance or devise, and the court shall see that the
' exchange or reinvestment is properly made."

From section 2d of General Taylor's will to the last paragraph of the last codicil, the language used by the testator to describe the estate left to his daughters is either, "*they are to have the entire, sole, and* ' *exclusive benefits of the rents and profits of the same du-* ' *ring their natural lives, and at their deaths to go to their* ' *heirs in fee forever;*" or, they "*are to have the sole* ' *and exclusive use and benefit, &c.*" (*General Taylor's Will.*)

The estate then of Mrs. Williamson was a separate estate. The property devised was for the "separate use of a married woman." It could not be taken from her but by decree of the chancellor. She was powerless herself to divest herself of it. The deed to Willis was a nullity, void, passing nothing. George Williamson never had the life estate, he consequently cannot maintain this action, and the court below erred in decreeing him a partition.

But let us admit the statute did not forbid and annul the conveyance, has he a vested remainder in the property? Did the remainder vest "*eo instanti*" upon the death of General Taylor in his grandchildren? What is a vested remainder?

"*A vested remainder, otherwise called a remainder exe-* ' *cuted, is that by which a present interest passes to the* ' *party, though to be enjoyed in future, and by which the* ' *estate is invariably fixed to remain to a determinate per-* ' *son after the estate is spent.*" (*Crabb's Real Property, section 2,329.*)

"*Such an estate may be transferred, aliened, and chang-* ' *ed nearly in the same manner as an estate in possession.*" (*Idem.*)

If then the children of Mrs. Williamson took a vested remainder in their mother's estate "*eo instanti*" upon the death of General Taylor, it was a fixed, definite, certain estate, which they might dispose of as of any other property, but of which they could not be divested or deprived, save by their own act.

In section 9 of General Taylor's will he directs twelve hundred acres of Bank Lick to be divided in-

to four tracts of equal value, and gives one tract to each of his children; the tracts or lots which he gives to his daughters, he says: "they are to have, hold, and enjoy the rents and profits of the same for their separate and sole use during their natural lives, and at their deaths the title to the land is to vest in their heirs in fee forever." Numerically speaking, Mrs. Williamson's portion of this piece of land would be three hundred acres, title in fee in remainder, to one-ninth of which, vested in each of her children upon General Taylor's death if Mr. Williamson sets forth the fact, and inasmuch as the balance of the Bank Lick tract, the daughters of General Taylor chose not to have sold in accordance with the permission given in the 2d codicil, that stands in the same position as the twelve hundred acres.

In the 2d section of his will General Taylor says, "If it should so happen that any one of my children 'are dissatisfied with the devises made them, and 'should prefer property devised to another, and 'should wish to exchange property so devised with 'each other, I hereby empower them to make such 'exchange with each other of any property herein 'devised them, and to transfer the title each to the 'other."

Now by what right could Mrs. Williamson transfer the title to this piece of property to Mrs. Harris or James Taylor, if each child of Mrs. Williamson had a vested remainder of one-ninth in it?

The language used in regard to the Ohio farms and the Pannel's Bottom tract of land is identical with that used in devising the Bank Lick tract. If Mr. Williamson's views are correct, and the claim of his petition just, each of Mrs. Williamson's children has a vested remainder therein. Now, in section 21, the testator says, "If the Ohio farms and lands and 'the Pannel Bottom tract in Kentucky, devised to 'my said three daughters, should be found not to be 'productive, and if my said daughters or any one of 'them should desire to exchange the same for pro-

'ductive property either in Covington, Cincinnati, or 'Newport, or may desire to sell the same, I hereby 'direct that said exchange or sale may be made." But, could Mrs. Williamson, if she desired it ever so intensely, interfere with vested rights, and divest her children of that remainder which Mr. Williamson says vested in them upon the death of their grand-father?

In the 29th section of his will General Taylor says, "when any of my grandsons become of age, or when 'any of my granddaughters shall marry, my daughters 'may divide and set off to their said son or daugh-'ters one-half of the estate or property that said 'grandchild would be entitled to at the death of 'their mother, and the said property so set off and 'apportioned to such child, shall vest in said child, 'and not be subject to division when the mother 'dies."

If the estate vested at the death of General Tay-lor, how can it re-vest by the act of apportionment made by the mother? How could Mrs. Williamson divest her other eight children of their ninths of a piece of property and vest it in James Williamson—their vested remainder being an estate, in the language of the law, "invariably fixed?"

Let us see how this construction would operate. Mrs. Williamson fancies a piece of property in Ohio, and she wishes to exchange Pannel Bottom for it, but James Williamson has a vested remainder; he objects, or he has sold it to a money lender, and he objects. In vain Mrs. Williamson appeals to the will of her father, in vain she urges that he never intended her enjoyment of his bounty should be fettered and trammelled by an alien and a stranger in blood—the Jew is ready with his response: "Mr. 'Williamson says James Williamson took at his 'grandfather's death a vested remainder in that prop-'erty—he is of age, and has a right to sell a vested 'remainder—he has sold it—I bought it, and I object 'to your interference with my vested rights."

Mr. Williamson comes forward and mournfully suggests that he has been so unfortunate as to lose Edward and Corfield, two sons who had vested remainders, and that being heir in Kentucky, he objects to an exchange of property there for property in Ohio, where he is not heir of his children.

What! she indignantly exclaims, you whose name is never mentioned in all the 39 sections of my father's will—you concerning whom its very silence is eloquently expressive—you who are not permitted to collect a dollar of rent without a power of attorney from me—you have a vested remainder!—a larger estate than any child I have! a greater estate than I myself! Yes, madam, I know your father's mind was so occupied with providing for his own offspring and descendants that my little claims were overlooked, but I have read much of black letter law, and the remainder having vested, I am the heir of Edward and Corfield.

Mrs. Williamson may not know it, but there is one response to Mr. Williamson overwhelming in its strength and force. The intention of the testator shall govern, and of his intention concerning you, no man with the most infinitesimal fraction of an idea can doubt.

If Mr. Williamson can claim partition here, he can claim it of every portion of property devised to the daughters of General Taylor, or in which they had an interest; he can arrest the executor, paralize his action, unsettle the titles vested in the grandchildren of General Taylor, by operation of deeds from his daughters in pursuance of powers granted by the 29th section, plunge the estate and all connected with it in wild confusion, not because General Taylor gave him power to do so, but because Edward and Corfield have been "gathered to their fathers."

That General Taylor did not intend his will should be so perverted, it would be impertinence to the good sense of the court to urge; but could it be possible that a man of such mature sagacity and shrewd-

ness—a man who had gathered and held together a collossal fortune—a man whose whole life had made him familiar with instruments controlling and disposing of real estate, should have left a matter of this importance in doubt or obscurity. Justice to his memory requires a refutation of the suspicion.

General Taylor has not by ambiguous language left his intention in uncertainty and doubt; he devises the property under discussion as well as every other piece of property to his daughters—*to them for their natural lives,* and *at their deaths* the title to the same is to vest in their heirs in fee forever. Sometimes he says at their "demise," but always making the vesting of the remainder dependent on their deaths. Were we to disregard that wise and liberal provision of the law, which in the construction of one's last will and testament, looks to the intention of the testator, which disregards and liberally interprets even technical language when it appears to have been unadvisedly used, which supplies formal terms and technical words when such addition is necessary to carry out the testator's views—were we to examine this will with all the rigor and rigidness of comment which would properly be brought to bear upon the interpretation of a black letter deed, always to be construed most strongly against the grantor, still Mr. Williamson would read in every paragraph and section the death warrant of his ambitious aspirations to seize two-ninths of this estate. We are willing to stand literally upon the bond, and give his pound of flesh—"*at their* (the daughters) deaths, the title is to vest in their heirs in fee forever," "*nemo est hœris viventis.*" Mrs. Williamson's heirs may, by a dispensation of Providence, be her brothers and sisters, may be her nephews and nieces, or their descendants; never can be George T. Williamson's until this property reverts back to the great ancestor Adam, and the chain of descent comes down afresh from him to his descendant George T. Williamson; the death of his children prior to that

of his wife would cut him off forever, and sever every link which connected him with the estate. Could Mr. Williamson persuade himself into silent patience until the demise of Mrs. Williamson, then the remainders would vest, and his speculations upon the probable advantages to himself of the diminution of the number of his offspring would assume a shape of more practical interest. But why embarrass the discussion of this question with ingenious surmises upon questions foreign to the subject—why wander and loose ourselves in the intricate mazes of technicality, when high above our path there gleams the light to guide us in our construction and dispel the darkness with which ingenious counsel have shadowed this subject? ("The intention of the testator.")

The intention which is breathed in every page, sentence, and line of General Taylor's will, that his own descendants alone should inherit and enjoy his property, why affect to doubt his wishes, when after disposing of princely fortunes, after providing for children and grandchildren, after remembering in kind bequests even his household servants who had grown gray in his service, he closes a will of thirty-nine sections without a single reference to Mr. Williamson? We are told of "darkness which may be felt;" when we remember that Mr. Williamson was the son-in-law of General Taylor, is not this silence, silence which has assumed as it were tangible shape and material existence, and which, at least, by Mr. Williamson ought to *be felt*,—eloquence of words could but poorly translate the stern resolves of the testator upon this subject

Will then the court of appeals lend itself to the effort to evade the intention of the testator by technical chicanery and legal legerdemain? Its proud reputation for half a century refutes the thought.

We respectfully claim that the court below erred in decreeing two-ninths of the part of General Taylor's bequests allotted to Mrs. Williamson to her hus-

band George T. Williamson, and do ask for a reversal of the decree.

*Geo. T. Williamson* and *H. C. Harris* for appellees—

This controversy grows out of the devises to be found in General Taylor's will, in relation to the "Bank Lick" tract of land in Kenton county, specifically devised in the 9th and 28th sections, and the first codicil, and the 2d section of the 2d codicil. But this case depends more particularly on the rights arising under the 9th section of the will, and 2d section of the 2d codicil.

James Taylor, Jr., heretofore filed his petition in the Kenton circuit court, making the devisees of his father, and the children of the devisees parties, and prayed to have the tracts of land divided, and the rights and estates of the devisees determined in the 2d section of the 2d codicil, and 9th section of the will. On the hearing of the case a decree was pronounced, from which James Taylor appealed to this court, which reversed the decree, and gave instructions as to the manner the tracts should be divided; and decided the *character of the estate* which the daughters were entitled to, as an estate for life, with remainder in fee to their children. (*Taylor vs. Williamson, MSS. June Term,* 1854.) On the return of the case, a division of the lands was made, and the lots assigned to each, Mrs. Williamson electing to take the lands.

In 1855, after Mrs. Williamson's share had been set apart, she, with her husband, conveyed by deeds, (her life estate in the lands,) two-ninth's to her son James T., and her daughter Keturah, both being of age, the latter unmarried. These children filed their petition in the Kenton circuit court, and ask for a partition of the tract assigned to, and conveyed to them by their mother, alledging that two other of their brothers had deceased after the death of General Taylor, and that their father, Geo. T., claimed to inherit the shares of those dying—that is two-ninths.

On the final hearing of this cause the circuit court decided that Geo. T. Williamson, the father, *was entitled to two-ninths of the land*, the shares of his deceased children, both of whom having died under age, without issue, intestate, and unmarried, and directed partition of the lands into nine parts.

The counsel for the infant heirs of Mrs. Williamson, have appealed from that decision to this court.

Did the court err in decreeing two-ninths of the lands to Geo. T. Williamson, the father of E. and C., his deceased children?

This must depend on the construction of the Statute of 1796, in regard to descents, as the right accrued prior to the adoption of the Revised Statutes; but even if this were not so, the *new Statutes* are precisely the same as the Statute of 1796. It is assumed, because the will of Gen. Taylor so declares it, and this court in all the cases, in which it has decided on the character of the estate devised to the daughters of Gen. Taylor, declares, the estate devised to them is but a life estate, with remainder in fee to his grandchildren, and that the title vested *eo instanti*, in fee, in the grand children alive at the death of the testator, and in the children born during the particular estate.

2. Taking the foregoing as closed questions, it is contended that the grand children do not *inherit* from their mothers, nor do they inherit any thing from Gen. Taylor, but take as PURCHASERS only. Indeed, it may be said, as beyond all doubt, that there is *no inheritable interest* in the life tenants. It therefore follows, that the interest, of Edward and Corfield Williamson, as devisees under Gen. Taylor's will, in the present case, *descends* according to the law of descents at the time of their death; as they were infants at their death, and died *intestate*, without issue, and *unmarried*, their shares in their grandfather's estate, according to the language of this court in the case of *Turner vs. Patterson*, 5 *Dana*, 296–297, and

which was referred to as expressly in point in the case of *Tibbatts vs. Berry, &c.*, 10 *B. Monroe, page* 489, in regard to the devises in Gen. Taylor's will, descended to their "*surviving father*," and not to their brothers and sisters. See 6 *J. J. Mar. Duncan vs. Laffrety's adm'r, page* 47; *Arnold vs. Arnold's ad'mr*, 11 *Ben. Monroe*, 81; *Phillips vs. Johnson*, 14 *Ben. Monroe*, 176; *Walters vs. Crutcher*, 15 *Ben. Monroe, page* 10; *Berry vs. Tibbatts &c.*, 10 *Ben. Monroe*, 489, last section on the page; *Wallingford vs. De Bell*, 15 *Ben. Monroe*, 151. In addition, as to *vesting of remainders*, we would also refer to 15 *Vesey, Jr.*, 122; *Syllabus, note a*, 16 *Vesey, Jr.*, 167; 1st *Desaussure's Chy. Reports*, 324. It is then assumed, as Edward and Corfield died without issue, intestate, infants, and unmarried, the shares of the estate of Gen. Taylor's devised to them as remaindermen descended to George T. Williamson, their father.

In addition to the cases cited, we refer the court to the 29th section of the will, where a power is given to set-off, divide, and apportion *one-half* of what the child may be entitled to at its mother's death, "then, in that event, the child or children that *may*
' *be born* is to have their full portion of the estate
' given to my daughters, and is to be taken out of the
' part not *divided*, but which remains in my daughter's
' hands until her death. The intention is, *that all* my
' grand children shall have an *equal share* of their
' mother's estate, except John Harris, who is provided
' for in this my will."

3. Has Mrs. Williamson the power to alienate her life estate in the lands to the plaintiffs, in the manner she has chosen to do; that is, whether her and her husband's conveyance to James and Keturah, her children, of her interest passes to them that interest so as to merge her life estate in the remainder?

The words of the devise gives to each one of the testators children "one lot or tract. The tracts or lots
' which I give to my daughters they are to have, hold,
' and enjoy *the rents and profits of the same*, for their

' *separate and sole use,* during, &c., and at their deaths, ' the title to the same is to *vest* in their heirs *in fee* ' forever." What is this devise to his daughter? It is a devise of the *"rents and profits"* of the lands to his daughters, as *separate estate,* for their separate *and sole use,* after a devise of the life estate. The life estate is one bequest, without any trust or use attached, and then the "rents and profits" are separ- rately devised to her "separate and sole use." They are not united or dependent. The testator might have granted a life estate to A, and the "rents and profits" of the same lands to B. (1 *Roper's Law of Legacies, page* 172.) Her life estate is not a *separate and sole use* to her; she cannot *separate and sole,* lease, or dispose of it, (her husband living.) We contend that the estate conveyed by Mrs. Williamson to her son and daughter is not such an estate as is embraced by *Rev. Stat. art.* 4, *sec.* 17, *page* 395.

It was certainly the object of the legislature, in the enactment, to place beyond the control of the husband, the separate estates of their wives, and to prevent them from being squandered, but it is believed that the "separate estates" referred to, were estates of a different kind from the one here. It alludes to lands and negroes, and personal property; not to rents and profits, and choses in action. Now it is contended, the only separate estate which Mrs. Williamson has in the land is in the *rents and profits.* Could she not dispose of this chattel without the Chancellor's aid? Could she not lease out the land from one to fifty years, if she lived so long? Must these *rents and profits* be *reinvested* for the *same use,* under the order of a court of equity? Such a course would defeat the purposes of the divise and result in benefit alone to the remainder-man.

If, indeed, the Statute of 1852 embraced these conveyances—it is contended the statute is retroactive, and operates on rights which existed before its passage, and therefore inapplicable. In addition to the arguments submitted, it would clearly be against

WILLIAMSON,&c
*vs.*
WILLIAMSON,&c

the policy of the law to *extend* the provisions of the Statute, to a case like the one before the court. It has always been the policy of the common law—since the passage of the Statutes of mortmain and uses—to unite the whole estate, *possession and title*, in the same person. Now this estate goes in the direction which Gen. Taylor, with almost pious care, *intended*; that is, that his grand children should enjoy his princely estate. These conveyances but carry out that design.

4. The next question that presents itself is that of partition. It was urged in the court below that partition could not be made because of the possibility, &c., of after-born children.

As to the possibility of other children, remaindermen, being born, during the period of the particular estate—and if so, what would be the condition of their claim, the estate being divided among those now living. It is undoubtedly the duty of the court to protect the interest of all, and at the same time not to procrastinate the rights of any, if there is any justifiable mode of procedure.

It is *possible* there may be others born during the period of her tenancy. And it is true, that if this partition is made as is sought, an after-born child would be entitled to its share. It cannot be precluded—it is not party to this suit—and on the termination of the present estate, it could recover its portion in whosoever hands the land might be. This is a risk that the present claimants would have to run in making division, that their shares might have to be diminished. The courts have, in numerous instances, decided that the possibility of an after-born child should not prevent partition. (*Willis vs. Slade*, 6 *Ves. Jr.* 498; *Story's Eq.* 1 vol. sec. 655; *Gaskel vs. Gaskel*, 6 *Sim.* 643; *Martin vs. Perryman*, 1 *Ch. R.* 235; *White & Tudor's Leading Cases in Eq.* 501; *Earl Clarendon vs. Hornby*, 1 *P. Wm.'s*, 446: *Bibb's Rep.* 3 vol. 508; *Striker vs. Mott, Paige's Ch. Rep.* 389; *Phillips vs. Johnson*, 14 *B. Mon.* 173.)

5. We here adduce some authorities, and make some references to Gen. Taylor's will, to prove that under the rule claimed by the other side these devises to the grand children of the testator have *vested*, and are not *contingent*; for it is contended by counsel on the other side that the various devises in the testator's will, where lands are given to his *daughters for life, and at their deaths to go and vest in their heirs in fee forever*, the daughters take an estate for life only, and at their deaths those who are in being then, and can bring themselves in the *character* of their heirs, shall take the fee—not in the *quality* of an heir; not as taking *then* an estate, by descent, had the *estate* been in the daughter—instead of only an estate for life—and the remainder is contingent, and cannot *vest* until the death of the life tenant, and it is ascertained who are the persons, that *at that period* can bring themselves under the *denomination* of heirs.

The meaning intended to be attached to the word "heir" by the testator must be adopted. (*Fearne on Con. Rem. sec.* 383–8; *Burchett vs. Durdant,* 2 *Vent.* 311; *James vs. Richardson,* 1 *Bro. Parl. Ca.* 493; *Darbison vs. Beaumont,* 1 *P. W.* 229; 1 *Bro. Parl.* 489; *Goodright vs. White,* 2 *Black Rep.* 1010; *as stated in Fearne,* 210–212.) Mr. Justice Buller, in the discussion of this rule in the case of *Hodgson, &c. vs. Am brose,* 4 *Burr,* 2579, says: "If a testator use *other words* which *manifestly, indicate what his intention was,* and show to a demonstration that he did not mean what the *technical words import,* in the sense which the *law* has *imposed* upon them, that *intention must prevail,* notwithstanding he has used *such technical words* in other parts of his will. (*Doug. Rep.* 337; *Foubl.* 407; *Dodson vs. Hay,* 3 *Bro. Ch. Ca.* 408.) Lord Hale sustains this doctrine in *King and Melling,* 1 *Vent.* 214, 225; 2 *Lev.* 59.

6. The term "heir" was used by the testator as synonymous with "children," as will be seen by reference to 29th, 30th, 32d, 35th, and 37th sections of

his will, and 2d section of the 2d codicil thereof. And if the various sections of the will are carefully examined, especially the 29th, which the court of appeals in *Ward vs. Tibbatts*, 10 *B. Mon.* 488, says "is ' justly relied on as showing clearly the intention of ' the testator, not only that his daughters should have ' no greater interest than for life, but his *grand chil-* ' *dren*, the children of each of those daughters, should ' have among them, at the death of their respective ' mothers *equal shares* of the estate, that is the prop- ' erty devised to the mothers for life" this intent is obvious.

7. The remainder in this instance is therefore within the exception to the fourth class of remainders of Fearne, as the *persons* to whom the remainder is limited, are *ascertained*, &c., and as we contend is a *vested* remainder.

The court of appeals, in *Tibbatts vs. Berry, et al*, 10 *Ben. Mon.* 488, in their opinion of the devises in this will, especially of the bearing of the 29th section say: "This section is justly relied on, in showing clearly the intention of the testator, not only that his daughters *should have no greater interest* than for life, under the devises referred to, but that his grand children, the children of each of those daughters, should have amongst them, at the death of their respective mothers, equal shares of the estate; that is, the property devised to the mother for life. And it is contended that if the section does not itself give an interest to the grand children, the explicit declaration of *intention* contained in it, must control the construction of the devises to which it refers; and that as it shows that by *the heirs* of his daughters, the testator meant *their children*, these devises should be construed as giving the estate to the daughters *for life, remainder to their children, in fee.* And that as they had children at the date of the will, and of the testator's death, the remainder VESTED, at the latter period, in such of the children as were then living,

subject to open and let in those who should afterwards be born."

"There is no devise of the ferries, or the profits thereof, to the daughters, but a devise of the profits, (or say, of the ferries,) to the daughters for life, to vest, at their respective deaths, in their respective children. It cannot be more than a devise to the daughters for life, remainder to their children respectively. Under this devise we are of opinion that the remainder vested in the children of the daughters, who were alive at the testator's death, and in all who might be afterwards born, at the moment of their birth; and that however the remainder in the living children might be affected by subsequent results, as their own death, or the birth of other children, it was an interest which authorized the prosecution of the writs by any of them. As to the vesting of the remainder, on the death of the testator, the case of *Turner vs. Pattterson*, 5 *Dana*, 296, and the authorities there cited, and to which others might be added, are referred to as expressly in point."

The doctrine established in *Turner vs. Patterson*, and various decisions of this court, is again affirmed in the case of *Phillips vs. Johnson*, 14 *B. Mon.* 176. "When a devise is to the mother for life, and then to the children, the right to the remainder vests in the children, as they are born, and if any of them die before the determining of the life estate, their interests *vests* in their heirs."

And in *Walters vs. Crutcher*, 15 *B. Mon.* 10, JUDGE SIMPSON, in delivering the opinion of the court, has most clearly set forth the doctrine of vested and contingent remainders. "*The present capacity* of taking effect in possession, *if the possession were to become vacant*, and not the certainty that the possession will become vacant, before the estate limited in remainder determines, universally distinguishes a vested remainder from one that is contingent." (2 *Cruise's Dig.* 270–2; 2 *Chitty's Black.* 169, *note* 13.) Now, in this case, *each child*, as it was born, *was capable* of taking the estate under the will, if the possession had

WILLIAMSON,&c become *vacant during its life*, and consequently *it took*
*vs.*
WILLIAMSON,&c *a vested interest*, which, on its death, passed to its legal representativ e."

Oct. 6, 1857.   Judge SIMPSON delivered the opinion of the court.

The last will and testament of General James Taylor contains the following devise of land owned by him in Kenton county in this state:

"I direct 1,200 acres of my Bank Lick tract (ex-
' cept the part hereinafter devised to my daughter
' Jane,) be divided into four tracts or parcels, all of
' which shall be of equal value, as near as may be
' possible; and I give and bequeath unto each one of
' my said children one lot or tract.   The tracts or lots
' which I give to my daughters they are to have, hold,
' and enjoy the rents and profits of the same for their
' separate and sole use during their natural lives,
' *and at their deaths the title to the same is to vest in their*
' *heirs in fee forever*.   The lot or tract which shall fall,
' or be allotted to my son James, out of the said
' Bank Lick tract, I hereby give to him and his heirs
·, ' forever:"

The testator directed the balance of the land he owned in Kenton county to be sold and disposed of, if his heirs should desire it, but if they should not wish it to be sold, it was to be equally divided among them.   He had three daughters, and one son; and after his death the land referred to was divided between them, they having preferred a division to a sale of it.

At the death of the testator, Mrs. Williamson, one of his daughters, had nine living children—two of whom have since died, under the age of twenty-one, and without issue; and two-ninths of the land allotted to their mother in that division is claimed by their father, George T. Williamson, as their heir at law, and also by virtue of a conveyance to him of the life estate therein of his wife deeded to him by Alexander F. Willis, to whom it had been previously conveyed by his wife and himself in the year 1855.

Mrs. Williamson and her husband, in the same year, conveyed to Keturah and James T. Williamson, two of her children, two undivided ninths of the same tract of land, and this action, to which they made their father and mother and brothers and sisters defendants, was brought by them for partition of said land.

The circuit court decided that the plaintiffs were entitled to partition; that their father was entitled to two undivided ninths of the land, and directed their respective shares to be allotted to them. From that judgment the infant defendants have appealed.

The principal questions in the case relate to the nature and character of the estate devised to the testator's grandchildren, and the power of the devisee for life to execute the deeds relied upon by the parties.

On the part of the appellants it is contended, as it regards the first question, that the devise in remainder being to the *heirs* of the devisee for life, and the vesting of the title being restricted by the express words of the devise to the time when the life estate should terminate, the remainder is contingent and not vested, and consequently nothing passed by descent to the father upon the death of the two children of Mrs. Williamson.

On the other side, it is contended, that the persons referred to by the testator, as the heirs of his daughters, are manifestley their children, who are the persons entitled in remainder, and that as they were capable of taking, at the time of the testator's death, the estate in remainder vested in such of them as were then living, and in after-born children as they came *in esse*. It is also contended that if the word "heirs," as employed in the will, is to be understood according to its technical meaning, still, under the settled principles of the law, the reminders were vested and not contingent.

The word "heir," in its strict technical sense, denotes the person on whom, at the ancestor's decease,

1. The word
*heir*, in its strict

WILLIAMSON,&c
vs.
WILLIAMSON,&c
techincal sense,
denotes the per-
son on whom, at
the ancestor's
decease, the law
casts the inheri-
tance. No per-
son can properly
sustain the char-
acter of heir in
the life-time of
the ancestor.—
(Jarm. on Wills,
vol. 2, side page,
13.) Wherefore,
a limitation to
the heirs of a
person in exist-
ence, (if it have
the other quali-
ties of a remain-
der,) must be a
contingent re-
mainder. Fearne
on Remainder,
chapter 1, section
2, side page, 5.
2. The principle
'that the present
capacity of ta-
king effect in
possession, if
the possession
were to become
vacant, and not
the certainty
that the posses-
sion will become
vacant before
the estate limit-
ed in remainder
determines, uni-
versally distin-
guishes a vested
remainder from
one that is con-
tingent,' (Wal-
ters, &c. vs.
Crutcher;&c., 15
B. Monroe, 10,)
has no applica-
tion in a case
where the event
which renders
the possession
vacant also re-
solves the con-
tingency upon
which the limi-
tation depends,
and makes that

the law casts the inheritance. During the life of the ancestor the heir must therefore be considered as a person either not in being or not ascertained, inasmuch as it is uncertain who will fill that character at the time of the ancestor's death. It would seem then to follow, that a limitation to the heirs of a person in existence, if it have the other qualities of a remainder, must be a contingent remainder. And such a limitation comes precisely within Mr. Fearne's 4th class of contingent remainders, viz: "Where the 'person to whom the remainder is limited is not yet 'ascertained, or not yet in being." (*Fearne on Remainders, chap.* 1, *sec.* 2, *side page* 5.) And in *Jarman on Wills,* 2 *vol. side page* 13, the author says, "It is 'clear no person can properly sustain the character 'of heir in the life time of the ancestor."

The principle recognized in the case of *Walters &c. vs Crutcher &c.*, 15 *B. Mon.* 10, "that the present 'capacity of taking effect in possession, if the pos'session were to become vacant, and not the cer'tainty that the possession will become vacant, be'fore the estate limited in remainder determines, 'universally distinguishes a vested remainder from 'one that is contingent," is strongly relied on to prove that the remainder in this case was vested and not contingent. But this principle, however general and universal it may be, has no application in a case like this, where the event which renders the possession vacant also resolves the contingency upon which the limitation depends, and makes that certain which was before uncertain. The possession becomes vacant by the death of the ancestor, and by the same event the persons who properly sustain the character of "heirs, are ascertained and rendered certain. This rule, therefore, cannot operate as a test in a case like this, where the estate in remainder is given to the heirs of the same person, who is devisee for life. But suppose A to be devisee for life, with remainder to the heirs of B, and then apply the rule relied upon, in order to determine whether, during the life of

B, the remainder would vest in his heirs, or be contingent, and it will be a fair application of the rule in an analagous case. In such a case, if the possession were to become vacant by the death of A, prior to the death of B, the estate in remainder could not take effect in possession, because during the life of B there would not be any person that could, properly and technically speaking, sustain the character of his heir, and therefore the limitation in remainder would fail, the death of B in the lifetime of A being the contingency on which it depended.

One of the examples given by Fearne, under this class of contingent remainders, exemplifies the inapplicability of the rule adverted to in *Walters*, *&c.* *vs Crutcher*, *&c.*, in such cases. Thus, if an estate be limited to two for life, remainder to the survivor of them in fee, the remainder is contingent, for it is uncertain who will be the survivor. (*Fearne on Con.* *Rem.* 9.)

Now in this case, during the whole time of the continuance of the life estate, the remainder could take effect, if the possession were to become vacant, by the termination of the life estate, but it would be because the event which determined the life estate resolved the contingency, and rendered that certain which was before uncertain. But the estate in remainder, notwithstanding its present capacity to take effect in possession, if the life estate were to terminate, would be contingent and not vested.

Under the .operation of the rule in Shelly's case, limitations to the heirs of a person who took a preceding estate of freehold were exceptions to the class of contingent remainders within which they appeared literally to fall; not however because the remainder vested in the heirs, but because, in such cases, the remainder to the heirs was immediately executed in the ancestor. Therefore, under this celebrated rule, the principle was established that a remainder to the heirs of a person who took a preceding estate of freehold, never was contingent on account of any

WILLIAMSON,&c
*vs.*
WILLIAMSON,&c
certain which was before uncertain. (*Fearne on Contingent Remainder*, 9.)

*3. The rule in Shelly's case has no application, and is not in force in Kent'y; and whether a remainder to the heirs of a person who takes a preceding estate in freehold is vested or contingent must be determined on general principles, inasmuch as the limitation in re-

WILLIAMSON,&c
*vs.*
WILLIAMSON,&c
mainder does
not vest in the
ancestor,nor en-
large his estate,
but his heirs
take under the
will as purchas-
ers, whether
their interest be
vested or contin-
gent.

event arising from the particular estate, taking that determination singly, but if contingent at all, became so in consequence of some other contingency in the limitation. But this principle resulted from the operation of this rule alone, and consequently the doctrine to which we have been referred, in *Preston on Estates*, in his treatise on the rule in Shelly's case, has no application here, where the rule is not in force; and the question, whether a remainder to the heirs of a person who takes a preceding estate of freehold is vested or contingent, must be determined on general principles, inasmuch as the limitation in remainder does not vest in the ancestor, nor enlarge his estate, but the heirs take under the will as purchasers, whether their interest be vested or contingent. In such a case the ancestor takes nothing but a life estate, and the devisees in remainder do not take as his heirs, but take under the will— the person or persons answering this description at his death, if the term be used in its legal sense, being the devisees, and entitled to the estate in remainder.

4. Notwith-
standing the
maxim *"nemo est
hœris viventis,"*
the testator who
devises to the
"heirs" of per-
sons in existence
may show, by
other expres-
sions in the will
that he uses the
word in its popu-
lar sense, as de-
noting children,
or those who, at
the execution of
the will, are the
apparent heirs
of a particular
person; in such
case the law con-
strues the words
in the sense in-
tended, and the
limitation is
deemed as con-

But although the word "heir," in its strict legal sense, denotes the person upon whom the law casts the inheritance on the decease of the ancestor, according to the maxim that *nemo est hœris viventis*, yet sometimes a testator who devises to the heirs of a person in existence shows, by other expressions in the will, that he uses the word heirs in a popular sense, to denote children, or the individuals who, at the time of the execution of the will, are the apparent heirs of a particular person. When such an intention is disclosed the law will construe it in the sense intended by the testator, and the word being referred to persons, both in being and ascertained, the limitation is not deemed contingent, but confers a vested remainder on the individuals designated.

There is another class of cases in which the ancestor being recognized by the will *as living*, and other indications appearing going to show that the

term *heir* was not used in its strictest sense by the testator, it has been held to mean the heir apparent of the ancestor named. (*Harbison vs Beaumont, P. Wms.* 229; *Goodright vs White*, 2 *Wm. Black*, 1010; *Heard vs Horton*, 1 *Dennio's Rep. Sup. Court N. York*, 165.)

The signification of the word heir, in all cases, is a question of intention. The word has, as we have seen, a legal and a popular meaning. When used alone by a testator, without any other expressions going to show that it was not used in its legal sense, it must be understood as having been so used by him; for the rational presumption is, that he understood the legal meaning of the words he has used. But if he use other expressions which clearly indicate what his intention was, and show that he did not mean what the word imports, in its legal acceptation, that intention must prevail, notwithstanding he has used the same word in other parts of the will.

It may be here remarked, that where the rule in Shelly's case is regarded as law, and has its legitimate operation, it is more important to determine the exact import of the word heir, in the sense in which it was used by the testator, than it is here, where the rule is not recognized; and where an estate for life may be devised to the ancestor, and the remainder to his heirs, who will take under the will as purchasers, whether they take as heirs according to the technical sense of the term, or as children or heirs apparent, according to its popular signification. Under the operation of the rule in Shelly's case, the intention of the testator was frequently defeated, and it became necessary, in order to effectuate such intention, when it was manifestly indicated, to construe the word heirs to mean children, or heirs apparent. But no such necessity exists here, for whether the term be understood in its legal sense, or according to its popular meaning, the same persons will take the estate in remainder

WILLIAMSON,&c
vs.
WILLIAMSON,&c

ferring a vested remainder on those designated. This principle is recogniz'd in another class of cases. (*Harbison vs. Beaumont, Pr. Wms.* 229; *Goodright v. White,* 2 *Black.* 1010; *Heard vs. Horton,* 1 *Denio's Rep. Sup. Court N. Y.* 165.)

5. The signification of the word "heir," in all cases, is a question of intention. The word has a legal and a popular meaning. When used alone, with out any other expressions going to show that it was *not* used in its legal sense, it must be understood as having been *so* used.

as devisees, with this difference only, that in the one case the remainder will be contingent, and in the other it will generally be vested; which difference may, however, upon the happening of certain events, affect materially the ultimate devolution of the property devised, and sometimes the intention of the testator will be best promoted by construing the word in one sense, and sometimes in the other.

In the devise under consideration, if the term heirs is to be understood in its technical sense, then all the descendants of the testator's daughter, who are living at the time of her death, whether they be her children, or her grandchildren, whose parents are dead, will come within the *character* and description of her heirs, and be entitled, in remainder, to the whole of the estate devised to her for life. If, however, it is to be understood in its popular sense, as referring to the children of the daughter, or her heirs apparent, and the remainder vested in them, then, as two of them have died without issue, their interest in' the estate in remainder, under our statute of descents, has vested in their father, to the exclusion of their brothers and sisters; and if, according to the provisions of the will, it did not vest in them, then if they had left issue, which had lived until the termination of the life estate, such issue not being embraced by the terms of the devise, as thus understood, would have been excluded from any participation in it.

The whole of the will must therefore be examined, in order that the intention of the testator, which is the governing principle in the construction of such instruments, may be ascertained, as well as the sense in which he used the word in question, and also the time fixed by him, if any, at which the estate in remainder was to vest.

The following parts of the will have been relied on, as tending most directly to elucidate the questions that arise between the parties in this controversy:

1st. To establish the position that the estate in remainder according to the intention of the testator, was not to vest until the death of the tenant for life, and that the word heirs was used in its technical sense, to denote such persons as would then come under the denomination of her heirs, not only the language of the devise under consideration, but that contained in various other sections of the will—which is a very long one, and disposes of a very large estate—has been referred to.

In the second section certain property is devised to the testator's three daughters, for their sole and exclusive use, "and at · their deaths *the title to said property is to vest* in *their heirs* in fee forever."

Precisely the same language is used in *sec.* 8, in which the testator disposed of his Mercer tract of land, on the Ohio river.   Also in *sec.* 10, in which he disposed of a farm in Union county.   And in *sections* 11, 12, 13, 15, 23, 27, and 28, in each one of which he devised a life estate in other property to his daughters or some one of them, he used the same language in substance, viz: that at the death of the mother *the title* to the property in which she had a life estate, was to *vest* in *her heirs* in fee forever.   In three other sections the language is modified, and the property devised to the mother for life is directed, at her death, "to go to her heirs in fee forever."

2d. On the other side, the 29*th section* is relied upon as explanatory of the sense in which the word *heirs* was used by the testator, and as tending to show, that the vesting mentioned in the foregoing sections had reference to the *possession* only, with which the devisees in remainder were to be invested at the time designated, and not to the *interest* devised.   *Sec.* 29, is as follows:   "When any of my grand-sons become ' of age, and when any one of my grand daughters ' shall marry, my daughters may divide and set off to ' their said son or daughters one-half of the estate or ' property that said grand child would be entitled to ' at the death of their mother; and the said property,

'so set off and apportioned to such child, shall vest 'in said child, and not subject to division when the 'mother dies. The remaining half of the estate devised to my daughters during their lives, as afore-'said, will go to their children in fee at their demise; 'and should any of my daughters have a child or children after any son or sons arrive at the age of twenty-one, or daughter or daughters marry and receive, 'and have divided among them the property above 'named, then, in that event, the child or children that 'may be born is to have their full portion of the estate given to my daughters, and it is to be taken 'out of the part not divided, but which remains in 'my daughter's hands until her death. The intention 'is that all my grand children shall have an equal 'share of their mother's estate, except John Harris, 'who is provided for in this, my will."

The following extracts from the will have also been referred to, among others, to show that the testator used the words heirs and children as synonymous:

*Sec.* 2, (*of* 2*d codicil.*) "If, however, it shall be 'found that the foregoing plan of leasing said ground 'will not be advantageous and profitable to *my heirs*, 'then I empower, &c."

And in the same section, it is said: "I hereby 'also direct that my daughter, Keturah Harris, is not 'to account to *my other heirs* for the 125 feet of ground 'given, &c."

*Sec.* 35. In this section the testator gave five acres of land to a negro named Mingo, during his natural life, and directed that at his death the same was to vest in his, the testator's, *heirs.* And in the same section, speaking of the devise to Mingo, he said. "At his death he is to do as he likes with the per-'sonal property; the land *reverts* to my *children.*"

*Sec.* 16, (which relates to the ferries.) "My chil-'dren are to have the rents and profits of said fer-'ries during their natural lives, for their separate, 'sole, and exclusive use and benefit, and at their

'deaths the same is to vest in *their children.* The 'children of my son James to have our fourth part of 'said ferries at his death."

It is perfectly manifest, from these extracts, and other parts of the will, that the testator, in reference to his own children, regarded them as his heirs, and used the words children and heirs as meaning the same persons. And with respect to his grand children, there can be no doubt that he regarded them as the heirs of their mothers; but whether the term *heirs,* which he used so frequently in creating the remainders which were to take effect after the death of his daughters, should be understood as meaning their children, and have that sense placed upon it, or should be taken in its legal sense, must depend in a great degree upon the question, which meaning of the word would be most consistent with and best calculated to advance the general intention of the testator, to be collected from all the provisions of his will considered together.

6. The testator's meaning, in the use of the word "heir," must be gathered from all the provisions of the will considered together.

The law favors that construction of a devise which will cause the interest to vest, and not to be contingent. It has therefore been held, that the adverbs of time, "when, &c.," "then, &c.," do not make any thing necessary to precede the vesting of the remainder in real estate, but only express the time when the remainder shall take effect in *possession,* and not when it shall become vested. (*Stanley vs. Stanley,* 16 *Vesey,* 491; *Perrin vs. Lyon, &c.* 9, *East.* 170; *Edwards vs. Symons,* 6 *Taunt.* 213; *Baraston's case,* 3 *Rep.* 19.)

The same principle is recognized by Fearne in his work on Contingent Remainders, (*page* 240,) where he says: "It sometimes happens that a remainder is 'limited in words which seem to import a contingen-'cy, though in fact they mean no more than would 'have been implied without them, or do not amount 'to a condition precedent, but only denote the 'time when the remainder is to vest in possession."

7. The law favors that construction of a devise which will cause the interest to vest, therefore the adverbs of time, *when,* &c., *then,* &c., are taken to express the time when the remainder shall take effect *in possession,* not when it shall vest. (*Stanley vs. Stanley,* 16 *Vesey,* 491; *Perrin vs. Lyon, &c.* 9 *East.* 170; *Edwards v. Symons,* 6 *Taunt.* 213; *Baraston's case,* 3 *Rep.*19;*Fearne on Remainder,* 240; *Moore vs. Lyons,* 25 *Wend.* 125; *Yeaton vs. Roberts,* 8 *Fos-*

WILLIAMSON,&c
vs.
WILLIAMSON,&c
ter's N. H. 459.)
The favor shown
to vested inter-
ests is not how-
ever to be so
pressed as to de-
feat the intent
of the testator.
(Richardson vs.
Wheatland, 7
Metcalf, 171.)

One of the examples given in illustration of this principle is the case of a devise to A for life, and afterwards to his first, second, third, and fourth sons in tail; and if the fourth son should die without issue, then to B; this was held to be a remainder vested in B.

The decision of the cases of *Moore vs. Lyons*, 25 *Wend.* 119; *Yeaton vs. Roberts*, 8 *Foster's N. H.* 459, as well as the above mentioned cases, and others to which we have been referred, was governed by the rule of construction, which interprets words that seemingly import a contingency, and the creation of a future interest as referring merely to the futurity of the possession, and not as designed to postpone the vesting. But in all these cases the words so interpreted, although seemingly creative of a future interest, were so used as not to have a certain and precise meaning, and were therefore interpreted in connection with the context and the subject of the devise, so as to favor the vesting of the estate devised.

The favor shown to vested interests is not however to be so pressed as to defeat the intent of the testator. (*Richardson vs. Wheatland,* 7 *Metcalf,* 171.)

This rule of construction is, therefore, excluded by an express declaration in a will, that the ulterior devisee shall take a vested interest at the period referred to, as such a declaration obviously carries with it an implied negation of an earlier period of vesting. ( 1 *Jarman on Wills,* 742, and the case of *Glanvill vs. Glanvill,* referred to by him.)

Now the peculiar terms in which the remainder in question, and many of the others are created, show

8. The words
used by the tes-
tator,in creating
the remainder,
viz: 'and at their
deaths the title to
the same is to vest
in their heirs in
fee forever,'
show clearly
that the testator
intended so to
limit the re-
mainders given

clearly that the testator intended so to limit the remainders given after the life estate to his daughters, that they should not vest until their deaths respectively. The language he uses is clear and explicit: "And at *their deaths* the *title to the same* is to *vest* in their *heirs* in fee forever;" that is, at the death of his daughters the *title* to the *same property* which he devised to them, was to *vest* in their heirs. There is

here clearly a certain time fixed, when the *title* to the property—shall vest in those entitled in remainder. The vesting referred to cannot be confined to the *possession*, because it is expressly stated that the *title* to the property shall then vest. If, therefore, the *title* is to vest in the heirs at the death of the mother, it cannot have vested previous to that time; for, as said in the case above referred to of *Glanvill vs. Glanvill*, there cannot be two periods of vesting, and by fixing one, the testator must be taken to have excluded the other.

It is certainly incumbent on those who contend that the language of the testator is not to be understood according to its natural and literal meaning, to exhibit some solid and satisfactory reasons, drawn from the subject matter of the devise, or its purposes and objects, the context, or from other provisions of the will, showing that the words employed in this clause are not to be understood in their clear, plain, and literal signification.

The only reason urged why it should not be so understood is, that the word *vest* is used by the testator in some of the clauses in his will, where it is uncertain whether it refers to the title or to the possession of the property devised, and as in such cases it will according to the well established rules of construction, be regarded as only expressing the time when the remainder shall take effect in possession, and not when it shall become vested, it should also be regarded as having been invariably used by the testator in the same sense.

But, as in the clause under consideration he has not left his meaning uncertain, but has expressly declared that the *title* shall not *vest* in the devisees in remainder until the expiration of the life estate, it is impossible, according to any reasonable rule of construction, so to restrict the meaning of the language used as to make it apply to the possession and not to the title of the property devised, especially as the testator has used precisely the same form of expres-

WILLIAMSON,&c
*vs.*
WILLIAMSON,&c

after the life estate to his daughters, that they should not vest until their deaths, respectively.

9. It is incumbent on those seeking to attach a meaning to the language used by the testator, different from its natural & literal meaning, to exhibit solid and satisfactory reasons, drawn from the subject, matter, purposes, objects or context of the devise or provisions of the will, in support of such construction.

sion in a large majority of the devises contained in his will. It might indeed be argued, with much more plausibility, that as he had thus in numerous instances, furnished a clear indication of his intention as to the time when the estates in remainder were to vest, that such intention should govern and control all those devises in which the language used left it uncertain *when* or at *what time* the title was to vest.

To show that the testator intended the estate in remainder to vest during the continuance of the life estate, that part of the 29*th section* of the will has been relied upon which provides, that when any of his grand sons became of age, and when any one of his grand daughters should marry, his daughters might divide and set off to their said son or daughter one-half of the estate or property that said grand child would be entitled to at the death of their mother; and the said property, so set off and apportioned to such child, should *vest in said child*, and not be subject to division when the mother died.

This provision proves most clearly *the persons* to whom the property devised to the daughters for life was to go after their death, but it does not prove when the title to the estate in remainder was to vest. Nor is it apparent, as contended, that the testator has in this section used the word *"vest"* as merely relating to the possession of the land—not the vesting of the title. For, as according to the previous provisions of his will, the estate in remainder was not to vest until the termination of the life estate, the rational construction of this clause of the will is, that the *title*, as well as the *possession* of that part of the property thus laid off should *vest* during the lifetime of the mother. The argument by which it is attempted to prove that the word *vest*, as used in this clause in the will relates exclusively to the possession, is that the child only derives the possession from the mother, and the vesting alluded to can therefore refer only to that which is conferred by her act; and from this position it is assumed that the title to

the property must have been in the child by the previous provision of the will. The fallacy of this argument consists in the assumption that whatever right to the property the child acquires under this provision of the will is derived from the mother. This, however, is an evident mistake. The right is conferred by the will, although the act of the mother is necessary to its enjoyment. The legal effect of the devise is, that the child is to have the property upon the condition that the mother shall designate it, and surrender her life estate therein to the devisee. The right is derived from the will; the act of the mother only gives effect to the devise. If, therefore, the devisee under this provision of the will acquires a title to the property, the testator must have used the word "*vest*," in relation to the title as well as to the possession.

There is nothing, therefore, in the 29th section of the will, which even tends to prove that the testator, when he declared that at the death of his daughters the *title* to the property which was devised to them for life should *vest* in their *heirs* in fee forever, did not mean what he said, or that he intended the title to vest, not at the time specified, but immediately upon his own death. Indeed, the rational deduction from the provisions of this section is, that he had expressed his meaning fully, and understanding that no right or title to the property would vest in the persons entitled in remainder, until the termination of the life estate, he made a conditional provision for them, which was to have effect in the meantime, and which was rendered more necessary on account of the contingent character of the estate in remainder which was devised to them.

In the 20*th*, 21*st*, *and* 23*rd sections* of the will, the testator's daughters were authorized and empowered to exchange lands with each other, or with their brother, James Taylor; also, with the advice of the executor, to exchange the lands in Ohio, and some land in Kentucky, which was specifically designated,

should they prove unproductive, for productive property in Cincinnati, Covington, or Newport; and by the 23rd *section*, the executor was authorized to exchange any of testator's lands in Kentucky, Ohio or Indiana for productive property in either of the above named cities. These powers might be exercised with respect to any lands devised to the daughters for life, with remainder to their heirs, and at any time before the death of the daughters. Their creation tends to prove that the testator did not intend to give to the devisees in remainder a vested estate until after the death of his daughters. For although the exercise of these powers might not to be wholly inconsistent with the existence of such a vested interest, yet it would, if the interests were vested, certainly be attended with much inconvenience and confusion, which it was desirable to avoid. The interests, if vested, would be subject to be divested by the exercise of the power; and as the power was created, it was manifestly proper that the estate in remainder should not vest during the time that it might be exercised. This may have been, and probably was, one reason why the testator fixed the death of his daughters as the time when the interests in remainder should vest.

Considering, therefore, the language used by the testator, the subject matter of the devise, the context, and his purposes and object as evinced by the other provisions of his will, we think there is not only an entire absence of any indication that he did not use the words referred to in their plain and literal signification, but on the contrary there is intrinsic and satisfactory evidence that he did so use them. Consequently the interest in remainder in the devise under consideration is contingent, and will not vest until the termination of the particular estate.

As already remarked, there can be no doubt that the testator regarded the children of his daughters as their heirs, and there can be as little doubt that he regarded the children of any such of their children

as might die in their mother's lifetime in the same light. Hence he used the comprehensive term *heirs*, by which he embraced all the descendants of his daughters. Having determined that the estate in remainder should not *vest* until the death of the mother, the use of the words *her children*, in the devise, would not have accomplished his object, because it might not have included her grandchildren whose parent was dead, and therefore he used the words *her heirs*, the appropriate words to convey his meaning, and to carry his intention into complete effect. When the mother dies her living children, and the descendants of such of them as may have died in her lifetime, constitute her heirs at law. They are the devisees in remainder, and take as such under the will, and not by descent from their mother. They are termed *her heirs* to point out and designate the persons who are to take as devisees, and not for any other purpose. The testator intended that the persons who were her heirs should have the same property at her death that he devised to her for life, except so far as that disposition of his estate might be modified by the operation of the 29*th section* of his will. He so expressed himself in various parts of the will, so that there can be no doubt but that such was his intention. To secure the accomplishment of this object he postponed the vesting of the estate in remainder, until the death of his daughter, because, if it vested in her lifetime, his intention might be defeated, and her *heirs*, instead of getting the same property which was devised to her for life, might only get a part of it. We thus ascertain that every object which the testator seems to have had in view will be best promoted by giving to the language he has used its legal and appropriate signification.

But it is said that this court has decided in the case of *Ward, &c. vs Tibbatts*, 10 *B. Monroe*, 473, that the word *heirs* in this will means *children*, and that the *children* of the daughters had a vested inte-

WILLIAMSON,&c
vs.
WILLIAMSON,&c
rest in the estate under some of the devises contained in the will. In that case, it was conceded, as it is in this one, that the testator regarded the children of his daughters as their *heirs*, and that they were referred to as such. The court however expressly declined deciding the question whether the interest of the grandchildren was vested or contingent, although the opinion was expressed that they took a vested interest under the devise contained in the 16*th* *section* of the will, in the profits of the ferries. As however that is a devise of the profits of the ferries to the testator's children during their natural lives, and at their death to *their children*, and not to *their heirs*, as in the devise under consideration, that opinion cannot affect the construction of those devises in which the word *heirs* and not children is used by the testator. But the question in that case was the right of the grandchildren to prosecute a writ of error to the decision of the court rejecting the will, and the court said it was by no means certain that they should not be considered as having such an interest in the establishment of the will as would authorize them to do it, even though they had no vested interest in the estate itself. And as it was not a suit for property, but a proceeding to establish a will, and the question was not as to the extent of the interest of the plaintiffs in the writ, but as to the existence of any interest, it was not deemed proper or necessary to go into the general question as to the construction and effect of the devises contained in the will. That case, therefore, merely decided that they had such an interest under the will as authorized them to insist on its establishment, and the question presented

10. The case of *Ward, &c. vs. Tibbatts,* 10 *B. Monroe,* 473, is decisive of none of the questions arising in this case.

therein would not have justified the court in undertaking to define or determine either the nature or extent of that interest. We do not therefore consider the decision in that case as settling any of the questions that arise in this, or as precluding us from adjudicating upon them as if they had been now presented for the first time.

We are therefore of the opinion that under this devise all those persons who come within the description of heirs of the mother, at the time of her death, will be entitled to the estate in remainder.

Our next inquiry will be directed to the legal effect and validity of the deeds which were executed by Mrs. Williamson and her husband.

The Revised Statutes, (*page* 395,) provides, that estates for the separate use of a married woman, created before their adoption, shall not be sold or encumbered but by order of a court of equity, and only for the purpose of exchange and reinvestment, for the same use as that of the original conveyance or devise.

It is contended, that under this provision of the Revised Statutes, these deeds are wholly invalid and inoperative. On the other side it is argued, that the devise to Mrs. Williamson not only invests her with a separate estate in the rents and profits of the land during her life, but also with the absolute title thereto during the same time, and that therefore the estate devised to her is not embraced by the statutory provisions referred to, and if it be, that the legislasure had no power to deprive her of the right to convey and dispose of it at her own discretion.

The language of the devise is, "I give and bequeath unto each one of my said children one lot 'or tract. The tracts or lots, which I give to my 'daughters they are to have hold, and enjoy the rents 'and profits of the same for their *separate* and *sole use* 'during their natural lives." The manner in which the testator's daughters are to hold and enjoy the land devised is clearly defined, and there is no foundation whatever for the distinction attempted to be drawn between the land itself and it issues and profits. There is but one estate created by the devise and that is in the land for the sole and separate use of the devisees during their natural lives. The appropriation of the issues and profits is in substance and effect an appropriation of the land itself. The

Williamson, &c
*vs.*
Williamson, &c

11. A devise of the *rents* and *profits* of land for the *separate and sole use* of the devisee during her natural life, is in substance and effect an appropriation of the land itself, and is a separate estate embraced by the provisions of the *Revised Statutes,* 395, which the devisee has no power to convey except in the manner therein prescribed. *Hopson vs. Burks,*

WILLIAMSON,&c
vs.
WILLIAMSON,&c
&c. ante; Daniel
v. Robinson, ante.

estate devised to Mrs. Williamson is, therefore, a separate estate, and expressly embraced by the statute.

In the case of *Hopson vs Burks, &c.,* (*manuscript opinion,*) decided at the last term of this court; it was held that a married woman had no power, since the Revised Statutes took effect, to convey her separate estate except in the manner therein prescribed. In that case, it is true, the power of the legislature to prescribe the manner in which married women might dispose of the separate estate which belonged to them was assumed to exist, and not being doubted or questioned was not considered nor expressly decided.

The mode of the translation of property from one individual to another is a matter of legislative regulation. The title to personal property now passes under a verbal contract. Could not the legislature provide that it should not pass except by a written conveyance? Such a law could not be made to operate upon past sales and transfers, for then it would affect vested rights; but certainly it would be no objection to its validity, that the persons who owned such property at the time of its passage were deprived of the right of transferring it by a verbal contract.

Married women can now convey their real estate, in conjunction with their husbands, by the acknowledgment of a deed before the clerk of the county court. Suppose the legislature should pass an act requiring such deeds to be acknowledged in open court, to make them valid, would such an act be an infringement of any right, or could the power of the legislature to pass it be questioned?

Before the adoption of the Revised Statutes Mrs. Williamson, although a married woman, had the power to alienate and convey her separate estate, at least such a conveyance was to some extent sustained in a court of equity. It was a power however which was frequently inconsistent with the nature

12. The mode of the translation of property from one individual to another is a matter of legislative regulation. The provisions of the Revised Statutes, chapter 44, art. 4, sec. 17, deprives married women of no rights in their separate estate, and there is no doubt of the power of the legislature to enact such a law.

and terms of her estate, and by the exercise of which <span>WILLIAMSON,&c</span>
the instrument creating the estate was disregarded <span>vs.<br>WILLIAMSON,&c</span>
and violated.

Now this provision in the Revised Statutes was enacted not only to protect the rights of married women, by securing their separate estates against their own improvidence, as well as all improper influences which might be attempted to be exercised over them, but also more effectually to secure the attainment of the object of the donor in their creation. Instead of depriving married women of any of their rights in their *separate estate*, it tends to secure them in the possession and enjoyment of them. The power to violate the instrument creating her estate, and to make a disposition of the property embraced by it inconsistent with and calculated to defeat the evident intention of the donor in making her the object of his bounty, cannot be regarded as such a vested right in a married woman as to place it beyond legislative control or regulation. Indeed, the existence of such a power was only recognized in a court of equity, and the propriety of permitting its exercise, unless it was expressly conferred by the instrument which created the estate, has been frequently questioned by the most enlightened chancellors.

Married women can still sell and convey their *separate estate*, but it must be done under the superintendence of a court of equity, and the proceeds must be reinvested for the same use as that contained in the conveyance or devise by which the estate was originally created. The mode in which the sale and conveyance are to be made is varied, but the charge is entirely consistent with the nature of the estate, and its operation is evidently advantageous to the owners of such property, by securing them in the continued enjoyment of it. As the proceeds, if a sale be made, are required to be reinvested for the separate use of the wife, she is thereby guarded against that influence to which her condition naturally subjects her, and which it is almost impossible for

VOL. XVIII.     25

WILLIAMSON,&c
vs
WILLIAMSON,&c

her to resist, by the withdrawal of all temptation for its exercise. There can be no doubt of the power of the legislature to enact such a law, and consequently the deeds made by Mrs. Williamson and her husband, disposing of her *separate estate*, having been executed since the Revised Statutes took effect, are wholly invalid and inoperative. Since the change in the law a married woman has no power to charge or encumber or dispose of her separate estate for any purpose whatever, in any other mode than in that prescribed by the statute. (*Daniel vs. Robinson*, *ante* 301.)

13. The act of 1856, (*vol.* 1,*session acts*,1855–6, *page* 58,) provides that the provisions of the *Revised Statutes*, *chap.* 44, *art.* 4, *sec.* 17, shall not apply to conveyances made before the passage of the Revised Stat., in which powers of sale and exchange were expressly given, but such powers may be executed according to the intention of the instrument.

By an act of the legislature, passed in 1856, (*vol.* 1, *ses. acts* 1855–6, *page* 58,) it was enacted that these provisions of the Revised Statutes should not apply to conveyances made before their passage, in which powers of sale and exchange were expressly given, but such powers might be executed according to the intention of the instrument.

There can be no doubt, therefore, of the right of Mrs. Williamson to exercise the power conferred upon her by the 29*th sec.*, or any other part of the will according to the intention of the testator. The deed however which was made by her and her husband to two of her children was not made in pursuance of, or in conformity with, the provisions of the will, and was consequently unauthorized and invalid. It purported to convey to each of the children the life estate of their mother in their part of the Bank Lick tract of land, and was made upon the assumption that she had a right to convey and dispose of her life estate as she deemed proper, without any regard to the provisions of the will. It was not made for the purpose of executing the power conferred upon her by the 29*th section* of the will, nor did it operate to vest the children with such an interest in the property embraced by it as they are entitled to under that section.

Inasmuch, therefore, as their mother's deed conferred no right on the plaintiffs, and their interest in

remainder is contingent, they were not in a condition to maintain an action for partition of the land.

And as the deed to George T. Williamson did not invest him with any title, and he did not acquire any by the death of his two children, they not having a vested interest in the land, he had no right to partition, and the judgment in his favor, as well as that which was rendered for the plaintiffs, is erroneous.

Wherefore, the judgment is reversed, and cause remanded, with directions to dismiss the plaintiffs petition and to render a judgment against the claim asserted by the defendant, George T. Williamson.